**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| U.S. MONEY RESERVE, INC. d/b/a | § | |
| UNITED STATES RARE COIN & | § | |
| BULLION RESERVE, | § | |
| | § | |
| Plaintiff & Counter-Defendant, | § | |
| | § | |
| v. | § | Civil Case No. 1:18-cv-577-LY |
| | § | |
| ARLENE M. KAGAN, WENDY C. WINER, | § | |
| AND ROBERT S. KAPLAN AS EXECUTORS | § | |
| OF THE ESTATE OF FLORENCE KAPLAN | § | |
| A/K/A FLORIE KAPLAN, DECEASED | § | |
| | § | |
| Defendants & Counter-Plaintiff. | § | |

## ARLENE M. KAGAN'S ORIGINAL COUNTERCLAIMS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant and Counter-Plaintiff Arlene M. Kagan, as Executor of the Estate of Florence Kaplan a/k/a Florie Kaplan, Deceased ("Defendant/Counter-Plaintiff" or "Kagan") and files her Original Counterclaims against Plaintiff/Counter-Defendant U.S. Money Reserve, Inc. d/b/a United States Rare Coin & Bullion Reserve ("Plaintiff/Counter-Defendant" or "USMR"), and alleges as follows:

## I.
### PARTIES

1.     Defendant and Counter-Plaintiff Arlene M. Kagan is a natural person residing in New York State.  Kagan proceeds herein as an executor and legal representative of the Estate of Florence Kaplan a/k/a Florie Kaplan, Deceased ("the Estate").  Florence Kaplan ("Mrs. Kaplan") was a citizen of New York at the time of her death.  Having been named as a legal representative

of the Estate, Counter-Plaintiff is deemed a citizen of New York as a matter of law, that being the state of her mother's citizenship at the time of her death. 28 U.S.C. § 1332(c)(2).

2.      Plaintiff and Counter-Defendant U.S. Money Reserve, Inc. is a Delaware corporation with its principal place of business at 8303 MOPAC, Suite B-300, Austin, Texas 78759. United States Rare Coin & Bullion Reserve is an assumed name of U.S. Money Reserve, Inc.

## II.
## VENUE AND JURISDICTION

3.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a),(c) because the amount in controversy exceeds $75,000 and there is complete diversity among the parties.

4.      Venue is appropriate under 28 U.S.C. § 1391(b) because this judicial district in which Counter-Defendant resides and because a substantial part of the events giving rise to the claims occurred in this District.

## III.
## FACTS

5.      Precious metal coin scams that prey upon seniors are replete in late night television ads, fearmongering websites, and persistent telemarketing campaigns. Attorneys General from across the nation have issued warnings and guidelines about the high risk of fraud in the collectible and bullion coin market. The Federal Trade Commission warns: "[i]f you're thinking about buying collectible coins as an investment, the Federal Trade Commission (FTC), the nation's consumer protection agency, has three words for you: research, research, research."[1] The Florida Attorney General cautions that "[s]lick telemarketers try to convince you that the

---

[1] https://www.consumer.ftc.gov/articles/0136-investing-collectible-coins

dollar is weak and that rare coins or gems or precious metals are a solid investment that quickly increases in value. Don't be fooled. Few consumers ever profit from investing in rare coins[.]"[2]

6.     Counter-Plaintiff's mother, Florence Kaplan, who is now deceased, was fraudulently induced to purchase over $250,000.00 of grossly overpriced coins from Counter-Defendant USMR during the final months of her life. After Mrs. Kaplan died in December 2017, Counter-Plaintiff discovered that the coins were actually only worth around a quarter of the prices charged by USMR and paid by Mrs. Kaplan prior to her death.

7.     Indeed, prior to her death, USMR relentlessly pursued Mrs. Kaplan with endless phone calls and pressure to buy its products, sometimes calling her cell phone four or five times in a single day, using deceptive personal relationships, advertising, and promises about the value of investing in USMR's coins and coin sets. The unethical tactics used by USMR against this ninety-four year old woman caused her to spend more than a quarter of a million dollars over a period of less than eight (8) months for coins that USMR knew were in fact worth a mere fraction of that amount.

8.     The Texas Attorney General warns that "[i]f coins you bought as an investment would have to double or triple in value before any gain could be realized, you may have been a victim of fraud."[3] The coins sold by USMR to Mrs. Kaplan, worth a fraction of the purchase prices, easily fit the bill.

Bullion, Collectible Coins, Precious Metals, and Coin Investment and Retirement Scams

9.     The AARP has concluded that "Gold and silver dealers often advertise heavily on media outlets aimed at older Americans […] Retirement-age investors can be especially

[2] http://myfloridalegal.com/pages.nsf/main/f2518fbd4a06d27685256cc9005e1bb2!opendocument
[3] https://www.texasattorneygeneral.gov/cpd/gold-coins

receptive to the idea that metals are a bulwark against economic instability."[4]  Precious metals are often touted as a wise and stable investment option that is less volatile or more predictable than general currency-based investments.  These claims feed upon the fears of individuals who wish to secure their wealth long-term.  The elderly, who are acutely aware and protective of the legacy they will be leaving behind, are frequent targets for this fearmongering.  As the Texas Attorney General explains, "Seniors make up about 14% of the U.S. population but account for 60% of callers to the National Fraud Information Center.  If you are a senior, be extra careful" to avoid being a victim of a scheme like these coin scams.[5]

10.     Commemorative coins are typically minted with only a quarter or half ounce of a precious metal to commemorate a special event or notable person.  The U.S. Mint makes these available to anyone who wants to buy them.  Their value does not fluctuate, typically, with the value of the underlying precious metal.  "Coin collectors refer to this collectible value as numismatic value, and they say it is determined by factors like the type of coin, the year it was minted, the place it was minted, and its condition – or 'grade.'"[6]

11.     Collectible coins have dubious numismatic value in the long run as investment vehicles when the initial markup and sale is high, and the ability to fully recoup one's investment has never been proven.

12.     Bullion coins, on the other hand, "are minted from precious metal, usually gold or silver, and bought for investment purposes from major banks, coin dealers, brokerage firms, and precious metal dealers.  Their value is based on their gold or silver bullion content. Prices fluctuate daily, depending on the price of gold and silver in the world markets."[7]  The U.S. Mint

[4] https://www.aarp.org/money/scams-fraud/info-2016/gold-coin-investment-scams.html
[5] https://www.texasattorneygeneral.gov/cpd/gold-coins
[6] https://www.consumer.ftc.gov/articles/0136-investing-collectible-coins
[7] https://www.consumer.ftc.gov/articles/0135-investing-bullion-and-bullion-coins

produces gold, silver, and platinum bullion coins with guaranteed precious metal content. "Proof" bullion coins from the U.S. Mint are sold to collectors in cases and at a markup, while uncirculated coins are sold to financial or other institutions at or near the "melt value" of the coins. The "melt value" of a bullion coin is the value of the coin if it were melted down and the materials were then sold.[8]

13.     Collectible bullion coins are usually sold at a markup. The FTC advises consumers: "Shop around. Most banks offer gold bullion, often at a lower markup than dealers."[9] For people looking for a quick return on their investment, the Florida Attorney General warns that "rare coins are not a liquid investment. That means that they cannot generally be resold quickly for a profit…[A]lthough you will buy your rare coins at retail prices, you will probably sell them at wholesale prices."[10]

14.     Despite government agencies' efforts to caution consumers about these scams, dealers continue to deceptively plaster their products with certifications to bolster confidence in the investment value of their products. Collectible coins (including the bullion coins sold to collectors) may be given a "grade" from one (1) to seventy (70) based upon the physical condition of the coin. MS-70, the highest "grade," is a "Mint State" coin with no post-production imperfections like scratches or dullness. However, "[v]alue and grading are merely subjective. That means that different people may have very different opinions about the value of the rare coins. Value can also be based on many different things (retail price, wholesale price, replacement cost, cash liquidation value, etc.)."[11] Coin scammers, as noted by the Minnesota Attorney General "sometimes try to gain credibility by claiming that the coins have been

---

[8] *Id.*
[9] *Id.*
[10] http://myfloridalegal.com/pages.nsf/main/f2518fbd4a06d27685256cc9005e1bb2!opendocument
[11] http://myfloridalegal.com/pages.nsf/main/f2518fbd4a06d27685256cc9005e1bb2!opendocument

professionally graded, when in fact the supposed 'grading company' is affiliated with the dealer. People interested in buying coins should closely scrutinize the entities involved in the transaction, examine the coins in person, if possible, and get a second opinion about the grade and value of the coins in question *before* agreeing to the deal."[12]  The FTC cautions: "The difference of one grade in the same coin can mean the loss or gain of thousands of dollars in value.  Subjectivity in grading means there is real inherent risk in coin investing."[13]

15.     As one financial advisor states, "These buyers have no idea of the economics involved.  They don't realize there is nobody out there willing to buy these coins."[14]  Markups for the initial purchaser are often several times the melt or resale value, thereby giving a severely exaggerated and deceptive impression of the value of the coin or metal purchased.  Senior citizens who are looking to secure their wealth for their children and grandchildren are the frequent unfortunate targets and victims of predatory overpricing and relentless advertising by these dealers.  As mentioned above, "[i]f coins you bought as an investment would have to double or triple in value before any gain could be realized, you may have been a victim of fraud."[15]

16.     "It is not uncommon for individual victims of rare coin investment scams to lose more than $100,000.00 to a single telemarketing scam."[16]

The Scheme: U.S. Money Reserve

17.     Counter-Defendant USMR sells collectible coins and bullion coins and bars and is precisely the sort of coin dealer about which Attorneys General have expressed concern.  It advertises on television, as well as online, and performs most of its sales via phone

---

[12] https://www.ag.state.mn.us/consumer/publications/CoinDealers.asp
[13] https://www.consumer.ftc.gov/articles/0136-investing-collectible-coins
[14] *Supra* at 4
[15] https://www.texasattorneygeneral.gov/cpd/gold-coins
[16] http://myfloridalegal.com/pages.nsf/main/f2518fbd4a06d27685256cc9005e1bb2!opendocument

conversations. Its TV prices can only be accessed via a phone sale, thereby catching the unwary in its telephone solicitation web. USMR relentlessly contacts and re-contacts individuals who have shown some interest in their products. Under the guise of personal concern for their target's well-being, USMR salespersons relentlessly contact their list of potential customers, building a rapport with vulnerable or lonely individuals and leveraging that repeated contact to induce the customer to purchase grossly overpriced merchandise over and over again. This type of telephone sales approach especially preys upon the lonely and elderly by offering a false sense of companionship, friendship, and trust between the sales representative and the customer. USMR works continually to reinforce this false sense of companionship, all while draining the customer's bank accounts.

18. USMR has an abysmal track record of engaging in fraudulent and unconscionable business practices. U.S. Money Reserve was cited in 2010 by the Texas Attorney General and forced to pay more than $5,000,000 in restitution for deceptive trade practices in Texas alone. Even so, USMR has continued its chicanery, taking advantage of unwary, and often elderly, investors like Mrs. Kaplan who have collectively lost millions of dollars in the process.

19. Public sources of information are rife with victims of this scam.[17]

20. Indeed, U.S. Money Reserve was doing business as "United States Rare Coin & Bullion Reserve" when its scheme was first attacked by the Texas Attorney General (now Governor Greg Abbott).

21. The core allegation against USMR asserted that:

F. [U.S. Money Reserve] heavily advertises the $5 bullion American Gold Eagles in its print and Television ads, offering the coins at no dealer mark-

---

[17] *See, e.g.*, https://www.ocregister.com/2016/11/15/coin-dealer-jailed-but-victims-of-his-nearly-18-million-scam-may-not-get-their-money-back/; https://nypost.com/2010/11/10/430g-coin-scam-golden-fleece; https://www.wtvq.com/2018/04/26/scam-alert-digging-investing-gold/; https://www.aarp.org/money/scams-fraud/info-2016/gold-coin-investment-scams.html.

up to entice consumers to call. However, once consumers called, U.S. Rare coin [U.S. Money Reserve] tried to sell them the more expensive proof or commemorative coins.

G. U.S. Rare Coin uses truisms from the bullion gold market, such as the value of the gold will up when the value of the dollar goes down, to sell the gold modern commemorative coins and proof coins. However, what is true for the bullion gold market is not necessarily true for the commemorative gold coin or proof gold coin markets. The value of commemorative and proof coins is based upon subjective factors such as age, rarity, and condition. The value of a bullion coin is objectively based upon the amount of precious metal in each coin and can be determined by looking at the spot price of the metal…[18]

22.     As the State of Texas discovered, U.S. Money Reserve had "priced its proof and commemorative coins higher than the retail market value for those coins" and also priced these coins significantly higher than the retail market price for "bullion coins containing the same amount of gold."[19]

23.     Moreover, the State of Texas found that "a higher percentage of the complaints come from older consumers."[20]

24.     The State concluded that this business practice constituted a "false, misleading and deceptive" act and practice, which is unlawful under the Texas Deceptive Trade Practices Act (Texas DTPA). (TEX. BUS. COMM. CODE § 17.46(a) and (b)).[21]

25.     To resolve the Attorney General's investigation, U.S. Money Reserve also agreed that it would not sell or advertise in any way that allowed a consumer to be under the

---

[18] Assurance of Voluntary Compliance, p. 5, *Texas v. U.S. Money Reserve, Inc.*, No. D-1-GV-11-001818 (Dist. Ct. of Travis County, 419th Judicial Dist. of Texas, Nov. 15, 2011) *available at* https://www.texasattorneygeneral.gov/newspubs/releases/2011/111611usmoney_avc.pdf. *See* Ex. A, attached hereto.
[19] *Id*. at 6.
[20] *Id*.
[21] *Id*.

misapprehension of certain facts.  As part of the resolution, USMR conceded certain matters, including:

> *"Prices for these items can rise and fall, thus buying these items carries risk."*

> *"The value of a rare coin depends in part on the price the consumer pays. If the consumer is acquiring a coin to make money, the consumer should evaluate the coin's current market value, potential for appreciation and liquidity."*

> *"Past performance of the coin or the market cannot predict the outcome."*

> *"U.S. Rare Coin will not misrepresent the expected growth in the value or worth of a coin."*

> *"U.S. Rare Coin [U.S. Money Reserve] will not represent that a consumer's previously purchased [coins] have increased in value with the increase in the spot price of gold unless the increase realized by the consumer is above the retail price paid by that consumer to U.S. Rare Coin for the particular coin.  The increase must be reflected in the value of the coin at the time of the representation."*

> *"U.S. Rare Coin will not represent that its salespeople are qualified to advice consumers on investments, other than advice relating to the numismatic purchases, unless the salesperson is a certified financial planner and is functioning as such on the call."*

> *"U.S. Rare Coin will not charge a customer's credit card account unless it has explicit authority from the consumer to do so for the particular transaction."*[22]

26.     U.S. Money Reserve stipulated that it would set aside $5,000,000 to pay restitution to any consumer who purchased the coins U.S. Money Reserve had been selling and who wished to recoup their money.

27.     However, years later, USMR has violated that agreement and is still predatorily selling coins to vulnerable individuals who are not in a position to adequately assess the value of the transaction and are not in a position to see through USMR's deceptive representations.

28.     USMR continues to advertise deceptively about the value and need for gold:

---

[22] *Id*. at 7-9.





29.     USMR also deceptively implies authority and government ratification of its practices through deceptive use of Philip N. Diehl's former position as Chair of the U.S. Mint. Mr. Diehl is "President of U.S. Money Reserve." Prior to joining U.S. Money Reserve, he held government positions in the Treasury and was "35th Director of the U.S. Mint." In its advertising, USMR refers to Mr. Diehl as the "Mint Director" – frequently omitting the fact that he is a *former* director and no longer affiliated with the federal government. Even so, USMR uses Diehl's former position to imply that he, and thereby USMR, have some kind of elevated level of authority and trustworthiness or the endorsement of the government.







USMR's Deception of Florence Kaplan

30.     In 2017, Mrs. Kaplan was an elderly ninety-four year old widow living alone. Over the final months of Mrs. Kaplan's life, USMR preyed on her solitude and her desire to protect her assets and provide her family with financial security in the future.

31.     Just as occurred in the Texas enforcement action by the Attorney General, Mrs. Kaplan was urged to invest her assets into the coins on the basis that the asset class would grow in value.

32.     Mrs. Kaplan was constantly contacted by USMR, harassed by USMR's salespeople, including Chad Perry ("Perry") and Earlene Walker ("Walker"), under the guise of "friendship" and then induced, based upon false and deceptive representations, to spend over $250,000.00 on coins and coin sets from USMR.

33.     In April 2017, USMR's President, Philip N. Diehl sent Mrs. Kaplan a letter on U.S. Money Reserve letter head congratulating her on "taking the first step toward a healthier financial future and making the move to diversify [her] savings with physical precious metals."



**U.S. MONEY**
R E S E R V E

April 5, 2017

Florence Kaplan
8846 Mission Rd
Leawood, KS 66206-1604
USA

Dear Florence:

Congratulations on taking the first step toward a healthier financial future and making the move to diversify your savings with physical precious metals. With over 400,000 clients and counting, U.S. Money Reserve is one of the nation's largest distributors of government-issued gold, silver and platinum. We have put over one billion dollars worth of physical precious metals into the hands of hard-working citizens—and as a result of the market's ability to protect and grow hard assets, our clients are very satisfied.

Whether you call it a modern day gold rush, a gold bull market run or even the dawn of a new golden era, the extraordinary performance of gold has put its impressive stamp on a global economy that continues to struggle. In just the 10 years leading up to its all-time high in 2011, the price of gold saw an incredible 600% increase. In addition to consistently outpacing major stock indexes, many analysts predict gold's current price to rise—even double—in the future. Now is the time to bolster your finances and take advantage of the precious metals' stellar performance before gold prices increase further.

The right information is crucial when making any financial decision, and our official Gold Information Kit has everything you need to know about diversifying with precious metals. The enclosed materials have been created and published exclusively by the U.S. Money Reserve to provide accurate and helpful guidance for both new gold buyers and market veterans alike.

Here at U.S. Money Reserve we are eager to help you and your family build the financial security and protection urgency involved when it comes to moving a portion of your assets into precious metals.

Call us at your earliest convenience. We look forward to speaking with you soon.

Sincerely,

Philip N. Diehl
President, U.S. Money Reserve
35th Director of the United States Mint

| Corporate Address | Phone: (855) 849-0968 | Shipping Address |
|---|---|---|
| 6500 River Place Blvd. • Bldg. 3, Ste. 400 | Fax: (512) 258-5957 | P.O. Box 170339 |
| Austin, TX 78730 | | Austin, TX 78717 |

34.     The letter references USMR's access to "government-issued gold, silver and platinum" and USMR's clients' satisfaction at the "the market's ability to protect and grow hard assets."

35.     Diehl's letter further touts a "gold bull market" and "the dawn of a new golden era", stating that the price of gold "saw an incredible 600% increase" in the 10 years leading up

to 2011, representing that analysts predicted that gold's current price would double and that gold is consistently "outpacing major stock indexes" as an investment vehicle.

36. The letter provides USMR's official "Gold Information Kit" providing Mrs. Kaplan with "everything [she needs] to know about diversifying with precious metals."

37. The letter is signed by Philip N. Diehl, as "President, U.S. Money Reserve, 35th Director of the United States Mint."

38. Nothing in the letter states that Mr. Diehl is a *former* U.S. Mint Director and is no longer employed by or associated with the United States Mint.

39. Further, nothing in the letter from Mr. Diehl references and/or distinguishes the sale of gold, silver, and platinum by USMR solely for commemorative or other coin collecting purposes.

40. Instead, USMR assures Mrs. Kaplan that her purchase of precious metals from USMR is a way to bolster her finances and to help her and her family build financial security and diversify her assets.

41. Relying on USMR's representations, Mrs. Kaplan purchased a coin set from USMR on April 25, 2017. She paid $9,378.00.

42. According to USMR, she made no other purchases from USMR until August 29, 2017, at which time she made an additional purchase of a single coin set for $9,378.00. In the first three weeks of September, she purchased four additional coin sets at prices ranging from $8,990.80 to $9,483.00 each. As of September 18, 2017, Mrs. Kaplan had purchased six (6) coin sets from USMR for a total of $55,472.85.

43. On September 26, 2017, Mrs. Kaplan made four (4) separate coin or coin set purchases, spending a total of $63,291.05 on twenty-two (22) coins *in a single day*.

44. One week later, in just two days, she made two (2) purchases (on October 3 and October 5) for a total $66,652.00 for twenty-four (24) items.

45. Then, one week later, on October 11, 2017, Mrs. Kaplan made a single $40,149.00 purchase for four (4) items.

46. Mrs. Kaplan made three (3) further purchases from USMR, on October 24, November 14, and November 28.[23]

47. In almost formulaic handwritten notes sent to Mrs. Kaplan on or about October 30, 2017, November 16, 2017, November 29, 2017, Perry, an Account Executive with USMR congratulates Mrs. Kaplan on her purchases and remarks on how enjoyable their conversation was. Each note is signed "God Bless" and "Your Friend" and included Perry's business card.



---

[23] This final purchase, occurring less than a week before Mrs. Kaplan's death, was refunded after her death and is not at issue in this suit.

48.     According to the phone records currently available to Counter-Plaintiff, Mrs. Kaplan was contacted on her cell phone alone at least thirty (30) times by USMR from October to December 2017.  The phone calls took place every few days, and sometimes USMR would call four or five times in a single day.  On those calls, salespeople, including Perry and Walker, sold Mrs. Kaplan fifty-nine (59) coins or coin sets at prices far above market value.

49.     Almost all of the coins purchased by Mrs. Kaplan were from the Reagan Legacy line.  While technically bullion coins, the purchase price of these coins is further exaggerated by the inclusion of a signature by Michael Reagan.  USMR encourages customers to complete their full set of the Reagan line, which includes four coin denominations ($5, $10, $25, and $50) for each year, 1986-present, to "maximize your wealth protection potential."







50. Mrs. Kaplan paid markups as high as five times the melt value of the materials for these Reagan coins.

51. She was not told that the market value of the coins was worth substantially less than what she was buying.

52.     She was not told that the market for the coins would have to double and double again for her to merely recoup the value of the money spent on her purported investment.

53.     She was not told that USMR knew that, based upon her purchase price, she was only purchasing the coins for novelty value, as a "keepsake", or otherwise that, at that price, the coins were not "investment" assets likely to appreciate enough (especially during her lifetime) to warrant the price.  True investment assets, such as the uncirculated bullion coins sold to financial institutions, on the other hand, are sold at prices much more closely pegged to the price of the actual commodity.

54.     USMR never explained nor disclosed to Mrs. Kaplan that her purchases would not result in any profit if she decided to sell the coins.

55.     Mrs. Kaplan passed away on December 4, 2017, just four months shy of her 95th birthday.

56.     At the time of her death, Mrs. Kaplan's domicile was in Nassau County, New York and she was a citizen of the State of New York.  After Mrs. Kaplan's death, probate proceedings were commenced in the State of New York, naming Counter-Plaintiff and her siblings as executors of the Estate.  The Surrogate's Court of the County of Nassau subsequently issued Letters Testamentary appointing Kaplan's living adult children, including Counter-Plaintiff as fiduciaries of her Estate.

57.     Records from Mrs. Kaplan's cell phone show that Mrs. Kaplan had four missed calls from USMR in the days leading up to her death, including a missed call on the day she died.

58.     When the calls from USMR continued to come in even *after* Mrs. Kaplan's passing – two calls on the day after she died and four calls the day after that – her daughter,

Counter-Plaintiff herein, finally called the number back to advise the caller of Mrs. Kaplan's death. At that time, she learned that the missed calls on her mother's phone were from USMR and its representatives, continuing their grotesque and incessant pattern of solicitation to take advantage of her mother.

59. After Mrs. Kaplan's daughter spoke to USMR's representative, USMR sent Counter-Plaintiff a "Personal Inventory Report for Florence Kaplan" reflecting the coin purchases made by Mrs. Kaplan between April and December 2017.[24]

60. It was not until after Mrs. Kaplan's death that her daughter learned that, over the course of the last months of her life, Mrs. Kaplan had been persuaded to pay at least a quarter of a million dollars for fifty-nine (59) coins or coin sets whose total actual value came nowhere near the purchase price she paid to USMR.

61. When Counter-Plaintiff contacted USMR and spoke to Perry about how to sell the coins and recoup her mother's purchases, he told her that he could not advise her as to how she could convert the coins back into the lost money beyond recommending that the Estate hold onto the coins for at least ten years, despite the fact that USMR did not have evidence to show that a ten-year wait period would make a difference in recovering the full amount USMR charged for the coins.

62. When Counter-Plaintiff attempted to value the coins on behalf of the Estate, she was informed by an expert in the coin industry that the coins were likely only worth about a quarter of the price that Mrs. Kaplan paid for them.

63. Mrs. Kaplan, and thereby the Estate, has been substantially injured because, based upon representations made by USMR, she converted available cash into these coins, which are not worth anywhere near the value of the price demanded and extracted by USMR for them.

---

[24] *See* Ex. B, attached hereto.

## IV.
## FIRST CLAIM FOR RELIEF
### Fraud and Fraud in the Inducement
*(U.S. Money Reserve)*

64.     Counter-Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

65.     USMR, through its President Diehl and salespeople including Perry and Walker made false, material, positive representations to Mrs. Kaplan grossly exaggerating the value of the coins and coin sets during their telephone sales conversations and in their written correspondence.

66.     The representations made to Mrs. Kaplan were material; they were representations that a reasonable person would consider important when deciding whether to purchase the coins and coin sets.

67.     At the time USMR representatives, including Diehl, Perry, and Walker made the positive assertions about the value of the coins and coin sets, they did so recklessly and without knowledge of the truth of the assertions.

68.     USMR representatives, including Diehl, Perry, and Walker made the representations with the intent of causing Mrs. Kaplan to purchase the coins and coin sets.

69.     Mrs. Kaplan relied upon the representations made by USMR representatives, including Diehl, Perry, and Walker when deciding to purchase the coins and coin sets.

70.     The representations made by USMR representatives, including Diehl, Perry, and Walker, grossly exaggerating the current and future value of the purchases, directly caused the injury to Mrs. Kaplan.

71.     At the time USMR representatives, including Diehl, Perry, and Walker made the statements, they were acting within the scope of their employment for USMR.

72. Additionally, in its marketing materials, communications, website, and advertisements, USMR made false, material, positive representations grossly exaggerating the value of the coins and coin sets.

73. USMR made these representations with actual knowledge that the representations were false and with the intent to cause Mrs. Kaplan to purchase the coins or coin sets.

74. Mrs. Kaplan actually relied upon the representations made by USMR and the representations were a direct cause of the harm to Mrs. Kaplan.

75. As detailed above, USMR, through its representatives, including Diehl, Perry, and Walker, made fraudulent statements to Mrs. Kaplan for the purpose and with the effect of inducing Mrs. Kaplan to enter into a contract for the sale of coins and coin sets in reliance upon those fraudulent statements.

76. Mrs. Kaplan actually relied upon the representations made by USMR, through its representatives, including Diehl, Perry, and Walker, when entering into the contract and the fraudulent inducement to contract was a direct cause of the harm to Mrs. Kaplan.

77. The injury to Mrs. Kaplan consists of the approximately $257,000.00 worth of fraudulent sales plus any and all service, shipping, or handling costs. Counter-Plaintiff on behalf of the Estate seeks economic damages equal to the total value of the injury plus exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1).

## V.
## SECOND CLAIM FOR RELIEF
### Breach of Contract
*(U.S. Money Reserve Only)*

78. Counter-Plaintiff incorporates all foregoing paragraphs as if fully set forth herein and pleads the following in the alternative.

79.     At the time of the sales, a contract or contracts existed between USMR and Mrs. Kaplan for the sale of the coins and coin sets, based upon the exchange of money and goods.

80.     Mrs. Kaplan performed under the contract or contracts by paying the sale price for the coins and coin sets.

81.     USMR breached the contract or contracts by failing to provide goods of the value promised in the contract or contracts. The coins and coin sets delivered were worth far less than the value promised by USMR.

82.     USMR's breach was a direct cause of the injury to Mrs. Kaplan.

83.     The injury to Mrs. Kaplan includes economic damages for the amount of the money exchanged under the contract or contracts, including all service, shipping, or handling costs. Counter-Plaintiff on behalf of the Estate seeks actual damages equal to the total value of the injury.

84.     Counter-Plaintiff also seeks her attorneys' fees.

85.     Alternately, Counter-Plaintiff seeks equitable relief to restore the value of the injury to Mrs. Kaplan. Counter-Plaintiff on behalf of the Estate is willing and able to return all coins and coin sets received from USMR under the contract or contracts in connection to any such equitable relief.

## VI.
## THIRD CLAIM FOR RELIEF
### Texas Deceptive Trade Practices Act (DTPA)
*(U.S. Money Reserve Only)*

86.     Counter-Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

87.     Counter-Plaintiff brings this action on behalf of the Estate of Florence Kaplan, the deceased. At all relevant times, Mrs. Kaplan was a consumer under the DTPA. Mrs. Kaplan

was an individual who acquired goods, in the form of coins and coin sets, by purchase. *See* TEX. BUS. & COM. CODE § 17.45(4).

88.     USMR may be sued under the DTPA, as it is a "person" who uses or employs false, misleading, or deceptive acts or practices, and is not exempt under TEX. BUS. & COM. CODE § 17.49 or another statute. *See* TEX. BUS. & COM. CODE § 17.50(a)(1). USMR is a corporation, which qualifies as a "person" for purposes of the DTPA. *See* TEX. BUS. & COM. CODE § 17.45(3). Additionally, USMR's relevant deceptive acts were made in connection with Mrs. Kaplan's purchase of goods from them. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996). USMR received a direct benefit from all of Mrs. Kaplan's relevant purchases in the form of money directly paid to USMR.

89.     USMR committed the following "wrongful acts" from the DTPA "laundry list":

   a.   USMR knowingly and intentionally represented that the coins and coin sets were of a particular standard, quality, or grade when they were not. *See* TEX. BUS. & COM. CODE § 17.46(b)(7). USMR's representations about the quality and value of the coins and coin sets were both a cause-in-fact of and substantial factor in, and therefore a producing cause of, Mrs. Kaplan's injury.

   b.   USMR knowingly and intentionally failed to disclose information about the value of the coins and coin sets with the intent to induce Mrs. Kaplan to enter into a purchasing transaction for the coins and coin sets that she would not have entered into if the information had been disclosed. *See* TEX. BUS. & COM. CODE § 17.46(b)(24). USMR withheld information about the true value of the coins and coin sets and about investigations into USMR's practices that would have altered Mrs. Kaplan's actions. USMR's actions were both a cause-in-fact of and substantial factor in, and therefore a producing cause of, Mrs. Kaplan's injury.

   c.   USMR knowingly and intentionally represented that the President of USMR had special sponsorship, approval, status, affiliation, and connection to the U.S. Government, which does not exist. TEX. BUS. & COM. CODE § 17.46(b)(5). USMR deceptively implies in its advertisements that Mr. Deihl retains an affiliation with the U.S. Mint by referring to him as the Mint Director and intentionally framing ads

to imply that Mr. Deihl is representing the opinions of the U.S. Government rather than USMR.

90. Additionally, in its pursuit of Mrs. Kaplan, USMR knowingly and intentionally engaged in an unconscionable course of action under the DTPA by taking advantage of Mrs. Kaplan's lack of knowledge, ability, experience, and capacity to a grossly unfair degree. *See* TEX. BUS. & COM. CODE § 17.50(a)(3). The unconscionable course of action included repeatedly harassing Mrs. Kaplan with sales calls and false representations about the value of the coins and coin sets, all of which accelerated in the final three months of her life. In a single day, September 26, 2017, Mrs. Kaplan, who was ninety-four years old, was induced to make four (4) purchases – spending a total of $63,291.05 on twenty-two (22) items. The accelerated pace and pressure applied by USMR to induce an elderly woman to purchase items that USMR knew were worth far less than advertised was an unconscionable course of action that resulted in over a quarter million dollars of "glaringly noticeable, flagrant, complete and unmitigated" unfair enrichment of USMR and loss to Mrs. Kaplan. *See Bradford v. Vento*, 46 S.W.3d 749, 760 (Tex. 2001). USMR's unconscionable course of action was both a cause-in-fact of and substantial factor in, and therefore a producing cause of, Mrs. Kaplan's injury.

91. Counter-Plaintiff seeks economic damages equal to the total injury as outlined above, including all service, shipping, or handling costs. TEX. BUS. & COM. CODE § 17.50(a). Counter-Plaintiff is also entitled to damages for mental anguish due to USMR's knowing or intentional behavior. TEX. BUS. & COM. CODE § 17.50(b)(1). Counter-Plaintiff also seeks treble damages under TEX. BUS. & COM. CODE § 17.50(b)(1) for both economic and mental anguish damages. Counter-Plaintiff further seeks court costs and reasonable attorney fees as authorized under TEX. BUS. & COM. CODE § 17.50(d).

## VII.

## FOURTH CLAIM FOR RELIEF
### Money Had and Received
*(U.S. Money Reserve Only)*

92.     Counter-Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

93.     USMR currently holds money that should, in equity and good conscience, belong to the Estate.  The Estate is entitled to a full refund for the amount of money Mrs. Kaplan paid USMR for the coins in excess of their actual value, as such sales were not made in good faith.

94.     The full value of the injury should be restored to Counter-Plaintiff on behalf of the Estate to prevent the unjust enrichment of USMR.

## VIII.

## DEMAND FOR JURY TRIAL

95.     Counter-Plaintiff demands trial by jury as to all issues so triable as a matter of right.


## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff requests the following relief and that the Court:

a.      Award economic and exemplary damages as requested above;

b.      Award treble damages and mental anguish damages as authorized under the DTPA;

c.      Provide equitable relief;

d.      Award pre- and post-judgment interest;

e.      Award reasonable and necessary attorneys' fees and costs; and

f.      For all such other and further relief as may be just and proper.

Dated: July 18, 2018                    Respectfully submitted,

                                        **STECKLER GRESHAM COCHRAN PLLC**


                                        */s/ Bruce Steckler*_____
                                        Bruce Steckler
                                        Texas Bar No. 00785039
                                        L. Kirstine Rogers
                                        Texas Bar No. 24033009
                                        12720 Hillcrest Rd. Suite 1045
                                        Dallas, Texas 75230
                                        P: 972-387-4040
                                        F: 972-387-4041
                                        bruce@stecklerlaw.com
                                        krogers@stecklerlaw.com

                                        **ATTORNEYS FOR DEFENDANTS**



                        **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of this document, and all attachments thereto, have been served on the following counsel of record in compliance with Federal Rule of Civil Procedure 5(b)(2) on this 18th day of July, 2018.

Chris Portner
J. Trenton Bond
PORTNER ♦ BOND, PLLC
1905 Calder Ave
Beaumont, Texas 77701
cportner@portnerbond.com
tbond@portnerbond.com


                                        */s/ Bruce Steckler*_____
                                        Bruce Steckler