IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| U.S. MONEY RESERVE, INC. D/B/A § <br> UNITED STATES RARE COIN & § <br> BULLION RESERVE, § <br> Plaintiff, § <br> V. § <br> § <br> ARLENE M. KAGAN, WENDY C. § <br> WINER, AND ROBERT S. KAPLAN AS § <br> EXECUTORS OF THE ESTATE , OF § <br> FLORENCE KAPLAN A/K/A FLORIE § <br> KAPLAN, DECEASED, § <br> Defendants. § | A-18-CV-577-LY |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE LEE YEAKEL
UNITED STATES DISTRICT JUDGE:

Before the court is U.S. Money Reserve, Inc.'s d/b/a United States Rare Coin & Bullion Reserve ("USMR") Opposed Motion to Compel Arbitration (Dkt. #11) and all related briefing.[1] Having reviewed the pleadings, the relevant case law, as well as the entire case file, and determining that oral arguments are not necessary, the undersigned issues the following Report and Recommendation to the District Court.

**I.    BACKGROUND**

USMR originally filed its declaratory judgment action in state court seeking a declaration that its dispute with Defendants are subject to an enforceable arbitration provision.  Although USMR stipulated that it was seeking less than $75,000 in damages, *see* Dkt. #1-2 (Compl.) at 4, Defendants removed the case under diversity jurisdiction contending the amount in controversy

---

[1] The motion was referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

1

actually exceeds $250,000. Dkt. #1 at ¶ 13. USMR does not dispute this contention. The court is satisfied that there is complete diversity between the parties and the amount in controversy exceeds $75,000. *See* Dkt. #1-4, #1-5, #1-7; *see also* 28 U.S.C. § 1332(c)(2). Defendants[2] assert counterclaims for fraud, breach of contract, Texas DTPA violations, and money had and received. Dkt. #8 (Counterclaims).

Defendants are the executors and legal representative of Florence Kaplan's estate. Mrs. Kaplan passed away on December 4, 2017, just four months before her 95th birthday. Dkt. #8 (Counterclaims) at ¶ 55. In April of 2017, Mrs. Kaplan purchased a coin set from USMR for $9,378.00. *Id*. at ¶ 41. In August of 2017, she purchased another coin set for the same amount. *Id*. at ¶ 42. In September of 2017, she purchased several more coin sets for over $100,000, including spending over $60,000 in a single day. *Id*. at ¶¶ 42-43. Again in October of 2017, she purchased additional items from USMR for over $100,000. *Id.* at ¶¶ 44-46. Her last purchase was made less than a week before her death.[3] *Id*. at ¶ 46. Defendants allege that USMR contacted Mrs. Kaplan on her cell phone at least 30 times from October 2017 to December 2017 and sometimes multiple times in a single day. *Id*. at ¶ 48. Generally, Defendants allege USMR's advertising misrepresented the value of the coins and Mrs. Kaplan paid more than five times the melt value of the coins. *Id*. at ¶¶ 17-63. Defendants seek to recover money that Mrs. Kaplan paid for the coins as well as exemplary and treble damages.

USMR moves to compel Defendants to arbitrate the dispute. In its motion, USMR relied solely on an arbitration provision in the "Packing Slip/Invoice" sent with each purchase. Dkt. #11 (Mtn.) at 5 ("The Invoices establish a valid agreement to arbitrate."). The "Packing

---

[2] The Counterclaims are only brought by one defendant, Arlene M. Kagan, the executor of Mrs. Kaplan's estate. *See* Dkt. #8 (Counterclaims). As that distinction is not material to this Motion and all Defendants oppose the Motion to Compel Arbitration, and for ease of clarity, this Report and Recommendation does not distinguish between Defendants collectively and Kagan as Counter-Plaintiff.

[3] The last purchase has been refunded and is not at issue.

Slip/Invoice" contains a description of the items purchased and their price. Dkt. #11-3. On the back of the "Packing Slip/Invoice" is a full-page arbitration, venue, and limitation of liability provision. The provision states, in part:

> Any controversy or claim arising out of or relating to transactions between you (also referred herein as "Client") and USMR or any of USMR's present or former officers, directors, agents or employees (collectively "USMR"), whether based in contract, statute, tort, warranty, or otherwise, shall be submitted to binding arbitration under the FAA in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time the arbitration commences. . . . By purchasing goods from USMR, you agree that all controversies between you and USMR which may arise from or relate to, directly or indirectly, any account you have with USMR or any transaction between you and USMR, regardless of the cause or claim asserted, shall be determined by arbitration. This arbitration provision shall apply to any controversy or claim or issue in any controversy arising from events which occur prior to, on or subsequent to the transaction that is the basis of this invoice.
> . . . .
> The Arbitrator shall have exclusive authority to resolve any dispute relating to the enforceability of this provision including, but not limited to, the determination of the scope, applicability, or enforceability of this provision to arbitrate and any claim that all or any part of this Agreement is void or voidable.

*Id*.

Defendants argued that there was no agreement to arbitrate because the agreement between USMR and Mrs. Kaplan to sell and purchase coins was fully formed before the arbitration provision was included in the Packing Slip, and USMR cannot unilaterally add more terms to the agreement without Mrs. Kaplan's consent. USMR's rebuttal to Defendants' argument is that "the Invoices were delivered with the coins, not several days after delivery." Dkt. #17 (Reply) at 4. USMR also makes the new argument that its website's User Agreement contains a similar arbitration provision that applies to both website and telephone orders, that Mrs. Kaplan judicially admitted she reviewed the website before purchasing the coins, and that "[Mrs.] Kaplan had the opportunity to review the terms of the User Agreement on the website

3

before she placed an order." Dkt. #17 (Reply) at 4. Defendants were granted to leave to file a sur-reply, in which they argue the website's User Agreement was not part of the parties' contracts because USMR did not show Mrs. Kaplan had actual or constructive notice of the User Agreement.

## II.     ARBITRATION AGREEMENTS

When a party seeks to compel arbitration based on a contract, the first question for the court is whether there is a contract between the parties at all. *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018) (citing *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201-02 (5th Cir. 2016)). In conducting this inquiry, courts distinguish between "validity" or "enforceability" challenges and "formation" or "existence" challenges. *Id.* (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)). "[W]here the 'very existence of a contract' containing the relevant arbitration agreement is called into question, the federal courts have authority and responsibility to decide the matter." *Id.* (quoting *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004)). Though the difference between formation and validity may be unclear at the margins, the Supreme Court has suggested that the category of arguments that question the very existence of an agreement include "whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *Id.* (citing *Buckeye Check Cashing*, 546 U.S. at 444 n.1). Whether the parties entered a valid arbitration contract turns on state contract law. *Kubala*, 830 F.3d at 202. Texas requires an offer, acceptance, and mutual assent to the terms of the agreement in

order to form a contract.[4]  *See Ibe v. Jones*, 836 F.3d 516, 524 (5th Cir. 2016); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007).

### III.   ANALYSIS

USMR contends Mrs. Kaplan is bound by the arbitration provisions found in the Packing Slips/Invoices of the goods received and in its website's User Agreement.  Defendants dispute that Mrs. Kaplan ever agreed to arbitrate any claims against USMR.  Thus, the court must determine whether the parties entered into an agreement that contained an arbitration provision.

#### A. Packing Slips/Invoices

USMR contends Mrs. Kaplan is bound by the arbitration clause found on the backside of the Packing Slip/Invoice that was sent with each of her coin purchases.  Defendants argue that the contract was already fully formed and agreed to before each Packing Slip/Invoice was sent, and thus any terms on the Packing Slip/Invoice could only be a proposal for additional terms that required Mrs. Kaplan's affirmative assent.

Contract formation requires "an offer and acceptance and a meeting of the minds on all essential terms." *Ibe*, 836 F.3d at 524.  Additionally, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods."  TEX. BUS. & COMM. CODE § 2.206(a)(2).  Additional terms are construed as proposals for addition to the contract.  *Id.* at § 2.207(b).  In a transaction between merchants, the additional terms become part of the contract unless the offer limits acceptance to the terms of the offer, the additional terms materially alter the contract, or they are rejected within a reasonable time. *Id.*; *Tubelite, a*

---

[4] The parties both apply Texas law to determine whether they agreed to arbitrate any disputes.  The court does so as well.  As the court determines the parties did not agree to arbitrate, the court makes no finding as to what law should apply to any agreement the parties did enter into.

*Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 804 (Tex. 1991) ("Such additional terms contained in forms transmitted subsequent to contract formation do not become a part of the contract under section 2.207" where the offer was limited to its terms).

In this case, Mrs. Kaplan offered to buy coins from USMR, and USMR accepted that offer when it either promised shipment or actually shipped the coins. TEX. BUS. & COMM. CODE § 2.206(a)(2). Accordingly, the contract was fully formed when USMR proposed additional terms in the form of the arbitration agreement on the Packing Slip/Invoice. As Mrs. Kaplan was not a merchant, the additional terms did not become part of her agreement unless she assented to them. USMR has made no argument and presented no evidence that she assented to the additional terms. Accordingly, they were not part of any of her purchase agreements and she is not bound by the arbitration provision contained on the back of the Packing Slips/Invoices.

### B.  Website User Agreement

The parties dispute whether Mrs. Kaplan was bound to the arbitration provision contained in USMR's website's User Agreement. USMR argues Mrs. Kaplan "judicially admitted that she reviewed the website prior to entering into a contract with USMR" when Defendants stated in their Counterclaims that:

> (a) . . . in its . . . website . . . USMR made false, material, position representations . . . (¶72 of Counterclaim).
> (b) Mrs. Kaplan actually relied upon the representations made by USMR . . . (¶74 of Counterclaim).
> (c) Mrs. Kaplan actually relied upon the representations made by USMR . . . when entering into the contract and the fraudulent inducement to contract was a direct cause of harm to Mrs. Kaplan. (¶76 of Counterclaim).

Dkt. #17 (Reply) at 3-4 (quoting Counterclaims ¶¶ 72, 74, 76). However, this portion of the Counterclaims states in its entirety:

> 72. Additionally, in its marketing materials, communications, website, and advertisements, USMR made false, material, positive representations grossly exaggerating the value of the coins and coin sets.
> 73. USMR made these representations with actual knowledge that the representations were false and with the intent to cause Mrs. Kaplan to purchase the coins or coin sets.
> 74. Mrs. Kaplan actually relied upon the representations made by USMR and the representations were a direct cause of the harm to Mrs. Kaplan.
> 75. As detailed above, USMR, through its representatives, including Diehl, Perry, and Walker, made fraudulent statements to Mrs. Kaplan for the purpose and with the effect of inducing Mrs. Kaplan to enter into a contract for the sale of coins and coin sets in reliance upon those fraudulent statements.
> 76. Mrs. Kaplan actually relied upon the representations made by USMR, through its representatives, including Diehl, Perry, and Walker, when entering into the contract and the fraudulent inducement to contract was a direct cause of the harm to Mrs. Kaplan.

Dkt. #8 (Counterclaims) at ¶¶ 72-76. Although the Counterclaims include website screenshots to exemplify USMR's allegedly fraudulent statements, the Counterclaims do not allege Mrs. Kaplan ever visited the website or purchased coins through the website.[5] Instead, the Counterclaims describe ongoing phone calls and letters received by Mrs. Kaplan from USMR. *Id.* at ¶¶ 32-37, 47-48. Notably, in describing the fraud claim, Defendants state that USMR representatives grossly exaggerated the value of the coins "during their telephone sales conversations and in their written correspondence" and do not mention statements made on USMR's website. *Id.* at ¶ 65. Accordingly, the court is skeptical that the allegations in the Counterclaims are judicial admissions that Mrs. Kaplan reviewed the website for the purposes of this motion. Nonetheless, the court examines whether Mrs. Kaplan would be bound by the website's arbitration provision if she had reviewed the website.

USMR has provided no evidence or argument that Mrs. Kaplan had actual or constructive knowledge of the website's User Agreement. In contrast, Defendants provided screenshots of

---

[5] *See* Dkt. #21 (Sur-Reply) at 5 ("Counter-Plaintiff never alleged that Mrs. Kaplan made any of her coin purchases through the USMR website. USMR has likewise not alleged or demonstrated that Mrs. Kaplan purchased coins online.").

7

the website that demonstrate the link to the User Agreement is provided at the very bottom of the webpage and no information about the User Agreement "pops up" when the webpage is initially located.  Dkt. #21 (Sur-Reply) at 2-3.  USMR also makes no argument and presents no evidence that Mrs. Kaplan affirmatively acknowledged the terms of the User Agreement, such as by clicking a button that indicates she agreed to the User Agreement's terms.  Such "clickwrap" agreements are often held to bind the website user.  *See May v. Expedia, Inc.*, No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018) (collecting cases), R&R adopted sub nom. at 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018).  In contrast, browsewrap agreements, where a notice or hyperlink on a website conditions use of the site upon compliance with certain terms or conditions, are typically unenforceable if the website fails to provide adequate notice of the terms and there is no showing of actual or constructive knowledge of the terms. *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *4-*7 (N.D. Tex. Sept. 12, 2007) (collecting cases); *see Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175-79 (9th Cir. 2014) (holding that "a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice").  Accordingly, USMR has failed to show that Mrs. Kaplan had actual or constructive knowledge of the website's User Agreement and its arbitration provision and that she assented to be bound by the User Agreement.

### C. Conclusion

USMR has failed to show that Mrs. Kaplan ever affirmatively agreed to be bound to an arbitration agreement in her dealings with USMR. Accordingly, it has failed to show that Defendants should be compelled to arbitrate their claims against USMR.

## IV. RECOMMENDATIONS

For the reasons given above, the undersigned **RECOMMENDS** the District Court **DENY** U.S. Money Reserve, Inc.'s d/b/a United States Rare Coin & Bullion Reserve Opposed Motion to Compel Arbitration (Dkt. #11).

## V. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).

SIGNED January 29, 2019.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE